Judgment rendered April 5, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,950-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                                Appellee

versus

AUSTIN WADE BOYD                                  Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 361,810

Honorable Katherine Clark Dorroh, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: G. Paul Marx

AUSTIN WADE BOYD                       Pro Se

JAMES E. STEWART, SR.                  Counsel for Appellee
District Attorney

KODIE K. SMITH
BRITNEY A. GREEN
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and THOMPSON, JJ.

**COX, J.**

This criminal appeal arises out of the First Judicial District Court, Caddo Parish, Louisiana. Defendant, Austin Boyd, was indicted for second degree murder, in violation of La. R.S. 14:30.1. Following a jury trial, a unanimous responsive verdict of negligent homicide in violation of La. R.S. 14:32 was returned. Boyd was adjudicated a fourth felony offender and sentenced to 20 years at hard labor. Boyd appeals, and challenges his sentence as constitutionally excessive. For the following reasons, Boyd's sentence is affirmed.

## FACTS

According to reports from responding Shreveport Police Officers, on October 12, 2018, first responders were dispatched to a home on 4649 N. Lakeshore Drive, Shreveport, Louisiana, in response to a stabbing. After speaking with several people on the scene, including Jared Berry ("Berry"), Christen Armstrong ("Armstrong"), and Kenneth Gibson ("Gibson"), the homeowner, officers discovered that Boyd stabbed the victim, Bernard Sollers, and fled the scene of the incident. Officers later found Boyd hiding in a boat stationed at a home directly behind Gibson's and arrested him. According to a police report, after Boyd was handcuffed, he stated, "man they were after me," and later asked, "is he alive," but did not clarify further. Officers later discovered a knife covered in blood, clothing, a backpack, and soap in the boat where Boyd hid.

After his arrest, Boyd was indicted for second degree murder in violation of La. R.S. 14:30.1. On April 20, 2021, a jury trial commenced, wherein the following testimony was adduced from the State's witnesses:

First, Lindsey Combest ("Combest") testified that she had been in a relationship with Sollers for three years. Combest stated that three or four days prior to the incident, Sollers had taken methamphetamine and suboxone and had not slept. Combest testified that on the day of the incident, she and Sollers were in the process of moving out of their apartment and into a spare room at Gibson's home. She explained that when they arrived, she borrowed Gibson's truck to meet a friend at Diamond Jack's casino, and Sollers stayed behind to sleep. Combest stated that she had been at the casino for hours when she received a text message to call Gibson, but her phone died before she could make the call. Combest stated that when she returned, she discovered that Sollers had been stabbed.

On cross-examination, Combest clarified that she took Gibson's truck because she needed to move heavier furniture. She then reiterated that Sollers had not slept in the days prior to the incident and stated that he would nod off and get confused, disoriented, and lethargic. Combest stated that Sollers usually carried a flashlight because he "had a thing for flashlights." Combest testified that she did not personally know Boyd, but knew that Boyd and Sollers grew up together and she had not seen any physical confrontation between the two.

Next, Armstrong testified that on the day of the incident, she, Sollers, and two other friends drove Combest's car to Berry's home. Armstrong stated she spent most of that morning with Sollers until he left to return Combest's car. She testified that after Sollers left, several more people arrived at Berry's home, including Boyd. Armstrong stated that everyone in the home had taken drugs and that she, Berry, and Boyd had taken methamphetamines, but Boyd also took an "ungodly" amount of Xanax.

2

Armstrong testified that around two or three in the morning, she, Berry, and Boyd left in Berry's truck to get needles from Gibson's home. She stated that during the drive, they each took more Xanax. Armstrong stated that when they arrived at Gibson's home, she noticed Sollers' car, and heard Boyd curse. She stated that she then jumped out of the vehicle and began beating the door, yelling, and cursing because Sollers was at Gibson's home with another woman,[1] Shasta Faust ("Faust"). Armstrong testified that at some point, Boyd slashed Sollers' tires and took Armstrong's backpack and another bag from the vehicle. Armstrong stated that after she attempted to stop Boyd from slashing the tires, she got back into Berry's truck.

Armstrong testified that shortly after this incident, Sollers exited the home; she stated that she did not see Sollers threaten or swing any object at Boyd but that Boyd simply charged at Sollers. She stated that after Sollers fell to the ground, she administered CPR on him. Armstrong stated that as she did so, Boyd dropped to the ground beside her and stated, "I killed him. What do I do?" Armstrong testified that at this point, Berry was upset with Boyd and in shock, and Faust and another woman left the scene. Armstrong also testified that when officers arrived, she provided them with the wrong name,[2] but stated in court that Boyd stabbed Sollers.

On cross-examination, Armstrong clarified that she had not slept for a few days but that she did get some sleep so that she "wasn't in the greatest state of mind, but [she] wasn't delirious." Armstrong testified that she had

---

[1] Armstrong testified that she and Sollers had been in a relationship at that time.

[2] Armstrong also testified that she told officers her name was Brittany Berry and that she was Berry's wife. Armstrong explained that she gave a false name because she had an outstanding warrant and did not want to get into trouble.

not taken drugs that day, and had the "clearest head around" because she was able to perform CPR on Sollers. She testified that leading up to the incident, Sollers took one of her backpacks when he left to return Combest's car. Armstrong clarified that after Boyd slashed Sollers' tires, she asked him to get her backpack from the vehicle. She stated that when Sollers exited Gibson's home, she only saw his back but could see he was holding a flashlight, or a "mini Maglite."[3]

Armstrong testified that she believed Boyd charged at Sollers because he used a lot of drugs. She stated that she believed that Boyd's thought process was altered because he was genuinely scared after the attack. She stated that if Boyd had been "sober and in control of his mind, that would never have happened." Armstrong then testified that she had known Boyd to have "anger issues," but that he was not a violent person.

Next, Faust, a relative of Gibson, testified that on the date of the incident, she arrived at Gibson's home between midnight and 2 a.m. She stated that Sollers was asleep in a back room, and Gibson left. Faust explained that at some point, Armstrong, Berry, and Boyd arrived and Armstrong repeatedly knocked on the door.[4] Faust said that she and another woman, identified as Gabby Heath ("Gabby"), threatened to call the police if Armstrong did not leave. However, Faust stated that before she could actually call the police, Sollers had woken up and gone outside. Faust stated that she could not hear what was said, but could see Boyd confronting Sollers, with the two almost face to face. Faust clarified that she did not

---

[3] She explained that she believed Sollers carried the flashlight because his keys were attached to it.

[4] Faust stated that she did not allow Armstrong to enter the home because Gibson did not allow people in his home when he was not present.

hear Sollers threaten Boyd or make any threatening gestures. Faust testified that it appeared as if Sollers had attempted to be peaceful with Boyd, and she believed that the matter was resolved when Boyd got into Berry's truck.

Faust testified that Boyd got out of the truck with something in his hand, and took off in a "full-speed run" toward Sollers. She stated that she believed that Sollers did not react to Boyd because he was still groggy from sleep. Faust then explained that when Boyd made contact, Sollers grabbed his side. She stated that she could not recall what Boyd did at this point but testified that Armstrong performed CPR on Sollers before she left the scene. Faust then admitted that she had taken drugs on the day of the incident but provided that she was not under the influence when Boyd stabbed Sollers.

On cross-examination, Faust clarified that she did not recall seeing anything in Sollers' hands when he went outside. Faust also testified that she had poor vision and indicated that she did not have any type of corrective lenses on when the incident occurred. However, Faust testified that leading up to the incident, she would have guessed that Boyd was approximately three feet away from Sollers before he confronted him. On redirect, Faust indicated that when Sollers exited the home, he stepped off of the porch and veered slightly left toward Gibson's mother's home, who lived in the adjacent duplex. She stated that it never seemed as though Sollers was confronting Boyd because he only took two to three steps and stopped.

Next, Gibson testified that he lived at the home on 4649 North Lakeshore Drive, where the incident took place. Gibson stated that he was not present when the incident occurred, because he was at Diamond Jacks Casino. Gibson indicated that his girlfriend, Samantha Logan, Faust, Sollers, and Combest were at his home during this time. Gibson stated that

he left the casino when he received a call from Gabby to call 911 because Sollers had been hurt.

The State then introduced testimony from the following first responders and medical professionals:

First, Milton Carroll III ("Carroll"), of the Caddo Parish Coroner's Office testified that as a death investigator, his primary responsibilities were to verify a death, to categorize the manner of death, to report findings for cause of death, and to issue death certificates following autopsies. Carroll primarily testified that Sollers died as a result of two stab wounds to his chest and abdomen.[5]

Clifford Nix, a paramedic for Caddo Parish Fire District 1, testified generally that when he arrived at the scene of the incident, he discovered that Sollers had been stabbed twice: once in the chest and once in the abdomen. Nix testified that he and other members of the fire department bandaged Sollers' wounds but stated Sollers died from his injuries on the way to the hospital.

Next, Corporal William Mikesell, of the Caddo Parish Sherriff's Office ("CPSO"), testified that after he was dispatched, he saw a woman administering CPR to Sollers, while another man, later identified as Berry, held his head upright.[6] Mikesell testified that once Sollers was placed in the medic unit, he placed the man and woman he initially saw into two separate patrol units. Mikesell stated that the woman gave a brief statement, and the

---

[5] Detective Jeremy Prudhome also testified that he attended Sollers' autopsy and noted wounds on his chest and lower abdomen.

[6] Detective Nathan Everett also testified that he interviewed Armstrong, Berry, Gibson, Gibson's mother, Faust, Boyd, and a few other persons later determined to be present when the incident occurred.

man provided him with the wrong name for the woman. Mikesell further stated that when he arrived, the suspect was not at the scene.

Corporal Greg McGee, of the patrol division for CPSO, then testified that he assisted Cpl. Mikesell. He stated that when he arrived he also saw a woman administering CPR to the victim, with another man nearby. Cpl. McGee stated that he could see obvious wounds on the victim, and he assisted by applying direct pressure on the wounds until paramedics arrived.

Next, Deputy Marcus Jeansonne ("Dep. Jeansonne"), an officer in the K-9 unit for CPSO, testified that he was called to search for Boyd.[7] Dep. Jeansonne stated that after he was told the direction Boyd went after fleeing the scene, he deployed his K-9 to search for Boyd. He stated that the K-9 led officers to a house directly behind the one he was dispatched to, and officers found Boyd hiding in a boat on the property.[8] Dep. Jeansonne stated that when they located Boyd, he put his hands up and stated, "Here I am."

Dep. Jeansonne testified that after Boyd was handcuffed and placed into a patrol unit,[9] officers searched the area and discovered a bloody knife, clothing, a backpack, and soap. On cross-examination, Dep. Jeansonne reiterated that Boyd complied with the officers and did not resist. He

---

[7] Deputy John Berry ("Dep. Berry") also testified that he assisted in the search. He reiterated that Boyd was found hiding in a boat and that he found a bloody handprint on the side of the boat where Boyd hid. Dep. Berry stated that after Boyd was handcuffed, Boyd seemed concerned and afraid. Likewise, Keith Morgan, another member of the patrol division for CPSO, also testified that Boyd was located at a home approximately one block from the scene of the incident.

[8] Keith Morgan ("Morgan"), another member of the patrol division for CPSO, also testified that Boyd was located at a home approximately one block from the scene of the incident.

[9] Deputy Jackson ("Dep. Jackson") testified that he was called to transport Boyd to LSU and then to the investigation department for questioning.

testified that after Boyd was handcuffed, Boyd asked twice, "is he alive," but then invoked his right to remain silent.

Thereafter, Corporal Matthew Foster ("Cpl. Foster") testified that he worked as a crime scene investigator for CPSO. Cpl. Foster identified several photographs of the crime scene the State entered into evidence, including pictures of the area Sollers was found, vehicles present at the scene, Armstrong's clothes she removed after administering CPR, general pictures of the inside of Gibson's home, the clothes Boyd wore, the knife Boyd left behind, and the boat and residence where Boyd was found.[10] On cross-examination, Cpl. Foster testified that he was later informed that a black folding knife was found near Sollers' body as well as a red metal flashlight.

Finally, Doctor Long Jin ("Dr. Jin") testified that he is a forensic pathologist and that he performed the autopsy on Sollers. Dr. Jin identified that Sollers sustained two injuries: a fatal stab wound to the left portion of his chest and a stab wound to the left abdomen. Dr. Jin also identified several bruises on Sollers' face and abrasions on his hands, which he testified indicated that there was a struggle. On cross-examination, Dr. Jin reviewed the toxicology report for Sollers.[11] Dr. Jin noted that Sollers had "710 nanogram[s] per milliliter [of methamphetamine] in [his] blood." He stated that blood levels of 200 to 600 nanograms per milliliter of methamphetamine caused its users to exhibit violent and irrational behavior.

---

[10] Katie Traweek, a forensic DNA analyst for North Louisiana Crime lab, also testified generally that she performed a DNA analysis for the blood found at the scene of the crime.

[11] Dr. Jin also noted that there were other drugs found in Sollers' system, including amphetamine, clonazepam, and benzodiazepines.

At the conclusion of the State's evidence, counsel for Boyd introduced the following testimony:

First, Sarah Boyd, Boyd's mother, testified that Boyd struggled with substance abuse since he was 13, shortly after his grandfather died. She stated that Boyd completed the Youth Challenge Program where he obtained his GED but ultimately relapsed. She stated that Boyd had been in rehab at least six times, and his longest period of sobriety was approximately six to seven months. Sarah also testified that the afternoon before the incident occurred, Boyd picked up and kept her prescription for Xanax. Next, Sarah Brown ("Brown") testified that she had known Boyd for years and that he was generally a kind-hearted person. Brown stated that she saw him two days before the incident occurred, and she could tell that Boyd was under the influence.[12]

Finally, Boyd, testifying on his own behalf, stated that he struggled with drug abuse since childhood and that he and Sollers had been friends for years and had generally gotten along. Boyd stated that a few days before the incident he had taken methamphetamine, approximately 40 Xanax pills, and had not slept. Boyd then testified that on the day of the incident, he drove with Berry and Armstrong to get needles but did not know Berry was going to Gibson's home. Boyd stated that when the group arrived, Armstrong indicated that Sollers was there and had taken her things.

Boyd stated that when Armstrong exited Berry's truck, they both went to Sollers' vehicle and Armstrong told Boyd to get her things and she went to knock on the door. Boyd indicated that there were several bags in the

[12] Sara Cobb ("Cobb") also testified that she knew Boyd but no substantive testimony was provided.

vehicle and he took all of them, assuming they belonged to Armstrong. Boyd stated that as he was putting Armstrong's items into Berry's truck, he noticed Sollers on the porch. He stated that he could not hear what Sollers was saying as there was a lot of commotion because Armstrong was yelling, and Faust and Gabby were talking. Boyd stated that while this was happening, Sollers acted in a threatening manner but stated that he initially tried to leave when he saw Sollers go back inside.

Boyd testified that he slashed two of Sollers' tires because he didn't want Sollers to attempt to follow him when his group left. Boyd stated that when Sollers came back outside, he noticed an object in Sollers' hand and Sollers made a gesture with it. Boyd testified that he told Sollers, "do not come swinging that bat at my head," and "you see what's in my hand. I will you know, I will stab you." Boyd stated that after he said this, he moved back toward Berry's truck but stated that Sollers ran at him. Boyd stated that, in response, he took two advancing steps and by the time Sollers "came straight down over" him, he had stabbed Sollers in the abdomen and chest. Boyd indicated that his actions were not intentional and that he feared for his life. Boyd stated that he did not kill Sollers out of rage or because he was under the influence, but because Sollers tried to attack him and he had the right to defend himself. Boyd stated that after he stabbed Sollers he attempted to leave because he was in disbelief about what happened.

On cross-examination, Boyd testified that he felt threatened by Sollers because his mannerisms felt hostile and he saw Sollers exit the home with an object in his hand. He stated that when Sollers exited the home the second time, they were about four feet apart before the altercation took place. Boyd then testified again that he did not kill Sollers because he was under the

10

influence, and that "if you take the drugs away, I would have done the same thing."

At the close of testimony, the jury returned a unanimous verdict of negligent homicide. On May 6, 2021, the State filed a fourth felony habitual offender bill of information against Boyd. The State argued that Boyd had two felony convictions for simple burglary on September 3, 2009, and August 4, 2015. The State further noted that Boyd was also convicted of felony theft on December 16, 2014. On September 14, 2021, a sentencing hearing was held on the habitual offender charge, and Boyd was adjudicated as a fourth felony offender. At the sentencing hearing, the trial court stated that it found the provisions in paragraphs one, two, and three of La. C. Cr. P. art. 894.1(A) to be applicable.

The trial court also considered the mitigating and aggravating factors in art. 894.1(B) and found the following aggravating factors: (1) that Boyd's conduct was deliberate and cruel to the victim because he stabbed him twice, which required inserting the knife once, pulling it out, and inserting the knife again; (2) Boyd knowingly created a risk of death or great bodily harm; (3) Boyd's intoxicated state at the time of the offense; and (4) that Boyd used violence against the victim, which resulted in loss of life. The trial court further concluded that there were no mitigating factors. Finally, in accordance with La. R.S. 15:529.1(A)(4)(b), the trial court sentenced Boyd to serve 20 years at hard labor without benefit of probation, parole, or suspension of sentence.

## DISCUSSION

On appeal, Boyd presents three assignments of error challenging his 20-year sentence following his adjudication as a fourth-felony offender.

11

The law concerning excessive sentences is well-settled; claims are reviewed by examining whether the trial court adequately considered the guidelines established in La. C. Cr. P. art. 894.1, and whether the sentence is constitutionally excessive. *State v. Vanhorn*, 52,583 (La. App. 2 Cir. 4/10/19), 268 So. 3d 357, *writ denied*, 19-00745 (La. 11/19/19), 282 So. 3d 1065. A review of the sentencing guidelines does not require a listing of every aggravating or mitigating circumstance. *Id.*

A sentence violates La. Const. art. I, §20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Efferson*, 52,306 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1153, *writ denied*,18-2052 (La. 4/15/19), 267 So. 3d 1131. To constitute an excessive sentence, a reviewing court must find that the penalty is so grossly disproportionate to the severity of the crime as to shock the sense of justice or that the sentence makes no reasonable contribution to acceptable penal goals and, therefore, is nothing more than the needless imposition of pain and suffering. *Id.*; *State v. Griffin*, 14-1214 (La. 10/14/15), 180 So. 3d 1262. The trial court has wide discretion in the imposition of sentences within the statutory limits and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. *Id.*; *State v. Trotter*, 54,496 (La. App. 2 Cir. 6/29/22), 342 So. 3d 1116. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *Id.*

By his first assignment of error, Boyd argues that his past history of substance abuse from his adolescence, punctuated by several rehabilitative attempts, until the date of the offense qualifies him as an "exceptional"

12

defendant, warranting a downward departure from the 20-year mandatory minimum sentence. Boyd argues that this struggle with substance abuse was evident as several witnesses testified that he had taken drugs for days leading up to the offense and that during the commission of the offense, his "blood level [was] in excess of 710, about 110 points over the level indicated for being "under the influence," and in the range for violent and irrational behavior." Boyd further argues that given his past offenses have all been crimes against property, this offense is an "unprecedent[ed] aberration," further warranting a downward departure in sentencing following his habitual offender adjudication. We disagree.

Boyd was convicted of negligent homicide, which carries a maximum term of five years, with or without hard labor. *See* La. R.S. 14:32. However, as a fourth-felony offender, Boyd faced a mandatory minimum of 20 years. La. R.S. 15:529.1(A)(4)(b).

The habitual offender law has also been found constitutional in its entirety, and the minimum sentences it imposes upon recidivists are also presumed to be constitutional. *State v. Johnson*, 97-1906 (La. 3/4/98), 79 So. 2d 672; *State v. Thompson*, 50,392 (La. App. 2 Cir. 2/24/16), 189 So. 3d 1139, *writ denied*, 16-0535 (La. 3/31/17), 217 So. 3d 358. While the Louisiana Supreme Court has stated that courts have the power to declare a mandatory minimum sentence excessive under La. Const. Art. I, § 20, this power should only be exercised in rare cases and only when the court is firmly convinced that the minimum sentence is excessive. *State v. Dale*, 50,195 (La. App. 2 Cir. 11/18/15), 180 So. 3d 528, *writ denied*, 15-2291 (La. 4/4/16), 190 So. 3d 1203 . A court may depart below the mandatory minimum sentence only if it finds clear and convincing evidence in the

13

particular case before it which would rebut the presumption of constitutionality. However, departures from mandatory minimum sentences by their nature are exceedingly rare. *State v. Noble*, 12-1923 (La. 4/19/13), 114 So. 3d 500.

The classes of exceptional offenders for whom presumptively constitutional mandatory sentences are nevertheless excessive as applied to them, are exceedingly narrow. *Id.* The burden is on the defendant to rebut the presumption that a mandatory minimum sentence is constitutional. To do so, the defendant must clearly and convincingly show that he is exceptional, or that because of unusual circumstances, the defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. *Thompson, supra*. Importantly, the court may not rely solely on the nonviolent nature of the instant or past crimes as evidence to justify rebutting the presumption of constitutionality. The lack of violence cannot be the only reason, or even the major reason, for declaring such a sentence excessive. *Id.*

After fully reviewing the record in this case, we find that Boyd did not prove by clear and convincing evidence that his struggle with addiction is an "exceptional" circumstance to warrant a downward departure in his sentence. While Boyd's struggle with addiction from a young age and subsequently in the criminal justice system is unfortunate, we cannot say this type of circumstance is a rare or exceptional case warranting a lenient departure from the mandated sentencing range. Furthermore, the trial court heard testimony from Boyd's mother concerning Boyd's past history with substance abuse and his criminal history. Importantly, however, the trial

court adequately considered the factors enumerated in art. 894.1 when sentencing Boyd as shown by the reasons stated in the record.

Given this, we do not find that Boyd proved by clear and convincing evidence that he was exceptional such that the mandatory sentence was not meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the case. Accordingly, this assignment is without merit.

By his second assignment of error, Boyd further argues that his sentence is constitutionally excessive, in part, because two legislative changes occurred since his conviction, disrupting his status as a fourth-felony offender. In adjudicating Boyd as a fourth-felony offender, the State presented the following prior offenses:

- July 14, 2009: Simple burglary. Boyd pled guilty to the offense and was placed on 18 months of supervised probation.
- November 19, 2014: Felony theft of $800. Boyd pled guilty and received a suspended two-year sentence, subject to a year of supervised probation.
- April 11, 2015: Simple burglary. Boyd was sentenced to three years at hard labor.

From this, Boyd argues that the Louisiana Legislature amended La. R.S. 14:67 such that the theft he committed in 2014 would now be considered a misdemeanor offense.

At the time Boyd committed the offense, La. R.S. 14:67 provided a sentence of up to five years where the amount taken was valued at $750, but less than $5,000. However, La. R.S. 14:67 now provides that "[w]hen the misappropriation or taking amounts to less than a value of one thousand dollars, the offender shall be imprisoned for not more than six months, or may be fined not more than one thousand dollars, or both." Accordingly,

15

under the amended version of La. R.S. 14:67, Boyd's offense would be considered a misdemeanor offense.

However, our courts have consistently held that the law in effect at the time of the commission of the offense is determinative of the penalty which the convicted accused must suffer. A defendant must be sentenced according to sentencing provisions in effect at the time of the commission of the offense. *State v. Sugasti*, 01-3407 (La. 6/21/02), 820 So. 2d 518. "The mere fact that a statute may be subsequently amended, after the commission of the crime, so as to modify or lessen the possible penalty to be imposed, does not extinguish liability for the offense committed under the former statute." *Id.* Moreover, the Louisiana Supreme Court has also held that "for multiple offender purposes, an offense which is subsequently reduced to a misdemeanor retains its felony status as of the time of commission." *State v. Blackwell,* 377 So. 2d 110, 112 (La. 1979).

Therefore, we find that the trial court correctly determined that Boyd was a fourth-felony offender based, in part, for this offense.

Second, Boyd argues that at the time he committed his first offense in 2009, he was 17 years old, and that since that time, the Raise the Age Act was enacted, which generally raised the age of juvenile court jurisdiction so that 17-year-olds were no longer automatically treated as adults in Louisiana. Because of this, Boyd argues that his "juvenile" offense cannot be relied upon for habitual offender enhancement. We disagree.

The Raise the Age Act was signed into law as Act 501 in June 2016, created the Juvenile Jurisdiction Planning and Implementation Act, and subsequently, the Louisiana Jurisdiction Planning & Implementation Council was created. In April 2017, the council released its first

recommendation to the legislature entitled, "Recommendations for the Implementation of Raising the Age of Juvenile Jurisdiction to Include 17-Year-Olds in Louisiana" which went into effect on March 1, 2019. This law went into effect in two phases:

> In the first phase, which goes into effect on July 1, 2018, all 17-year-olds charged with non-violent offenses will be considered juveniles. The second phase will become effective July 1, 2020. **At that point**, all 17-year-olds will be considered as juveniles if they come into contact with the justice system, regardless of the alleged offense. (Emphasis added).[13]

The language of the Act clearly indicates that this law is not retroactive in its application, but prospective such that all 17-year-olds, regardless of the offense committed, from July 1, 2020, *forward* would not automatically be placed into adult correctional facilities.

Because we find that there is no retroactive application of the Raise the Age Act, Boyd's simple burglary offense is not precluded from consideration for his habitual offender adjudication. Accordingly, we find that the trial court correctly determined that Boyd was a fourth-felony offender. Therefore, this assignment lacks merit.

In his final assignment of error, Boyd asserts that the trial court erred in discounting the jury's responsive verdict of negligent homicide, and instead opting to rely on its own factual findings for sentencing. Specifically, Boyd notes that during sentencing, the trial court opined that it did not understand the jury's verdict and that it felt the evidence supported a conviction of second degree murder or manslaughter, and stated that Boyd's conviction was a "gift." Specifically, in sentencing Boyd, the trial court stated:

---

[13] *See*, La. R.S. 15:1442.

17

> As I said, the jury found Mr. Boyd guilty of negligent
> homicide. I didn't understand that verdict. I thought the
> evidence proved that he was guilty of a greater crime, second-
> degree murder or manslaughter, and that I think he received a
> gift from the jury is my opinion.

From this, Boyd argues that the trial court imposed its own view of the facts during sentencing, which he asserts is the type of judicial intervention that undermines a jury verdict, and implicitly suggests that "a conscientious jury has not weighted the facts and made a fair decision," and ultimately impugns the jury process.  We disagree.

After a thorough review of the record and the transcript during sentencing, we find that there is no evidence that the trial court imputed its own view of the facts of this case when sentencing Boyd.  During the habitual offender hearing, the trial court, after reviewing the art. 894.1 factors, stated that it would have sentenced Boyd to five years at hard labor, the maximum sentence for negligent homicide, but after determining that Boyd was a fourth-felony offender, sentenced him to the mandatory minimum of 20 years at hard labor.  Specifically, the trial court stated:

> Had the multiple offender statute not been filed, I would have
> sentenced you to five years at hard labor, the maximum,
> because of the facts of the case.  But because [sic] the multiple
> offender bill has been filed and I have found you to be a fourth
> habitual offender, I'm obligated to follow Louisiana Revised
> Statute 15:529.1 and I'm required to apply the provisions of the
> law that were in effect on the date of your offense, that was
> October 12 of 2018. So[,] 15:529.1 [sic] if the fourth or
> subsequent felony is such that upon a first conviction the
> offender would be punishable by imprisonment for any term
> less than his natural life, then the following sentences apply.
>
> [I]f the fourth felony and no prior felony is defined as a crime
> of violence under Revised Statute 14:2[(B)], or as a sex offense
> under 15:541, the person shall be imprisoned for not less than
> 20 years nor more than twice the longest possible prescribed for
> a first conviction.  If twice the possible sentence prescribed for
> a first conviction is less than 20 years, the person shall be

imprisoned for 20 years. That's 15:529.1 4 B, effective August 1 of 2018[,] and in place until July 31, 2019.

Defendant's fourth felony and prior felonies are not crimes of violence as provided in 14:2[(B)] or they are also not sex offenses as defined in 15:541. Further, Louisiana Revised Statute 14:32[(C)(1)], the law governing negligent homicide directs that except as provided in paragraph two of the subsection, whoever commits the crime of negligent homicide shall be imprisoned with or without hard labor for not more than five years, fined not more than $5,000 or both. Accordingly, under 15:529.4[(B)] the Court is required to sentence the defendant to serve 20 years at hard labor with credit for time served.

From this, it is evident that the trial court sentenced Boyd based on his adjudication as a fourth-felony offender and not its own imputation of the facts of the case. Accordingly, we find that this assignment of error lacks merit.

*Error Patent*

Our error patent review reflects that the trial court informed Boyd that his sentence was to be served "without benefit of probation, parole, or suspension" of sentence. However, a sentence imposed pursuant to the habitual offender statute is to be imposed without benefit of probation or suspension of sentence, but does not include a provision that it be imposed without benefit of parole. La. R.S. 15:529.1(G). Although the minutes indicate that Boyd's sentence was "subject to the conditions provided by law," our court has made clear that when there is a discrepancy between the minutes and the transcript, the transcript prevails. *State v. Jackson*, 54,118 (La. App. 2 Cir. 11/17/21), 334 So. 3d 874. Accordingly, we remand this matter to the trial court to correct the minutes to reflect that Boyd's sentence should be 20 years at hard labor, with credit for time served, and without the benefit of probation or suspension of sentence.

## CONCLUSION

For the foregoing reasons, Boyd's conviction and sentence is affirmed.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**